Filed 3/27/25  P. v. Hanks CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN MARZETTE HANKS,<br><br>Defendant and Appellant. | F085636<br><br>(Super. Ct. No. CF00652173)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

William Safford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Louis M. Vasquez and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Jonathan Marzette Hanks appeals from the denial of his Penal Code[1] section 1172.6 (formerly § 1170.95) petition to vacate his 2000 first degree murder

---

[1]     All further undesignated statutory references are to the Penal Code.

conviction by jury. He contends the denial was not supported by sufficient evidence. Finding no error, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Facts*

Appellant and Rick Ryan were both members of a group of people who engaged in recreational drag racing. It was customary for members of the group to get together in the parking lot of a business called Bananas Hi Fi on the weekends to talk about and make plans for racing. On occasion, appellant would be accompanied by his wife who drove a green early 90's Honda Accord with non-standard rims.

On one night in October 1999, appellant and Ryan raced against one another. Ryan beat appellant, and because they had placed a wager on the race, appellant owed Ryan $100. The following week, while appellant and Ryan were speaking at Bananas Hi Fi, and Ryan was attempting to walk away from the conversation, a masked gunman appeared out of an alleyway and shot Ryan at close range several times, killing him.

On the night of the shooting, appellant had arrived with his wife in the green Honda Accord. Witnesses saw appellant talk to Ryan. One witness described the conversation as getting "heated" and heard Ryan ask appellant to pay him his money or leave and told him, "You are not wanted here anymore," to which appellant responded, "Okay. We'll see." Appellant appeared to leave the area.

Later, Aaron Weaver, a witness unrelated to the racing group, was walking in the area near Bananas Hi-Fi and saw two men get out of a white Honda Accord that was parked at a nearby business with a woman waiting in the driver's seat. He saw the men run across the street with one touching his waistband and saw the woman subsequently move the car.

Witnesses at Bananas Hi Fi saw appellant return and speak to Ryan a second time. Ryan appeared agitated and was walking away from appellant with his hands up, saying something along the lines of "You got nothing for me. Get away from me." Appellant

2.

was trying to get Ryan's attention and said, "Come here. Come here. Come with me. I got something to show you. We will take care of this right now" and told Ryan that he wanted to "settle this." Appellant appeared angry and one witness thought there would be a fight between the two.

During this conversation, witnesses saw appellant wave to the area from where the shooter emerged, appear to try to slow Ryan's progress walking away from him by positioning himself in front of Ryan, and point to Ryan in the moments before the shooting. After the shooting, witnesses also saw appellant and the shooter running away together.

Weaver, still nearby, heard the shots, and later saw the men from earlier running from the scene "gloating and laughing" and get back into the Accord. During police investigation, Weaver was unable to positively identify the perpetrators in a photographic lineup.

Eleven .40 caliber shell casings were recovered from the scene. Ryan had suffered two gunshot wounds to the head, two to the neck, five to the torso, and two to the arm, for a total of 11 gunshot wounds. The cause of death was determined to be multiple gunshot wounds.

Detective Michael Garcia testified that he spoke to appellant after the shooting. When Garcia asked appellant why anyone would shoot Ryan, appellant began talking about what the people who he raced with thought of him (appellant), including that he thought everyone hated and envied him because he had such a nice truck. Appellant admitted to being present at the scene but denied having anything to do with the shooting or waving at anyone. Appellant told Garcia that after the shooting, he attempted to call his mother but then called his friend David Walker's pager and that Walker came to pick him up.

Garcia further testified that Weaver looked at two photographic lineups and never identified appellant; though he did identify a photo of appellant's brother. On cross-

3.

examination, Garcia said at one point Weaver said that appellant's photo looked the least like the suspect. When Garcia showed Weaver a photograph of appellant's wife's green Honda Accord, Weaver said he had seen a white car, but the wheel covers were similar. He could not say for sure if the car in the photograph was the car he saw on the night of the shooting.

Walker testified that appellant had called him from jail and said he told police Walker had picked him up and to just go along with it. Walker admitted he did not pick up appellant on the night of the shooting.

Appellant testified that he had nothing to do with the shooting. He stated that, during the first conversation he had with Ryan the night of the shooting, they were talking about things like who was going to be racing that night. He said they were talking in a crowd of people, and at one point, Ryan asked in front of everyone if appellant was going to pay him and said, "Why don't you leave and go get my money?" Appellant went back to his wife's car, and the two left the scene in the car and argued about appellant paying Ryan because his wife only had $115. Eventually appellant's wife agreed to give him the money; she dropped him off at a Shell gas station and left. He approached Ryan and attempted to pay him; he pulled out the money and told Ryan, "What's up? … you want to deal with it? Let's deal with it," while putting his hands up. Ryan was walking away and pulled what looked like a key out of a pouch he was carrying. Appellant followed him and was still moving his hands and asked, "Did you want the money or what?" At this point, the shooter appeared and shot Ryan. Appellant denied knowing who the shooter was nor that it was going to happen. He ran after the shots were fired. He denied waving or pointing before the shooting. He did not own a white Honda. He admitted to lying to the police about Walker picking him up and explained he actually had a woman with whom he had had an extramarital affair pick him up after the shooting and did not want his wife to find out.

4.

The prosecution's theory was that appellant was guilty of the murder as a direct aider and abettor. The prosecutor argued appellant aided, encouraged, and facilitated the killing, as evidenced by his motive to kill Ryan due to being humiliated by him, as well as the evidence that appellant approached Ryan, followed him when he started to walk away, waved to the shooter, pointed at Ryan, tried to impede Ryan's path, stood there while the shooter killed Ryan, and ran away with the shooter.

The jury was instructed that appellant was accused of having committed the crime of murder. The jury was instructed on the elements of murder, the mental state required, that aiders and abettors are considered principals in the crime, and the elements of aiding and abetting. The jury was not instructed on the principles of felony murder or the natural and probable consequences doctrine.

## Conviction and Sentence

The jury found appellant guilty of first degree murder and found true an allegation that a principal in the commission of the murder armed with a firearm. Appellant subsequently admitted he had suffered two prison priors.

Appellant was sentenced to a prison term of 25 years to life for the murder conviction plus one year each for the prison priors and the firearm enhancement, for a total indeterminate term of 25 years to life plus a determinate term of three years.

## Section 1172.6 Proceedings

On February 22, 2022, appellant filed a petition for resentencing pursuant to section 1170.95 (now § 1172.6). The court appointed counsel for appellant and subsequently granted his request to represent himself in the proceedings.

On October 17, 2022, the court issued an order to show cause over the People's objection. The order indicated, "Because jurors were not instructed on felony murder or murder under the natural and probable consequences doctrine, the issue here is whether malice was imputed to petitioner 'based solely on [his] participation in a crime.' "

In its response to the court's order to show cause, the People maintained that appellant had not made a prima facie showing because the jury who convicted him were not instructed on the natural and probable consequences theory or the felony murder theory of liability and the theory on which the jury necessarily based its verdict—direct aiding and abetting liability—was not a theory in which malice was imputed.

The evidentiary hearing was conducted on December 12, 2022.  No live testimony was presented by either party.  The People submitted the trial transcript and the jury instructions, which the court received into evidence.  The People withdrew its request to admit the procedural history of the previous appellate opinion in light of appellant's objections, as it was solely being offered to prove appellant was convicted at trial but the trial transcript contained the reading of the verdict.

The People argued again that a prima facie showing had not been made, but in the alternative, the trial transcripts "independently confirm that what the jury found was, in fact, correct."  The People argued appellant directly aided and abetted first degree murder and that malice was not imputed to him in any manner.

Appellant's position was that the jury "never … ma[d]e a determination of whether or not I was an aider and abettor" nor that he possessed malice.  Appellant's argument was premised on the fact that the instructions inconsistently referred to "the perpetrator, the slayer, or the killer," rather than uniformly to the "defendant," which may have allowed the jury to find the shooter was guilty of murder, but not appellant.

The court took the matter under submission and noted, "My job at this point is to review all the relevant evidence, evaluate and resolve contradictions and make determinations as to credibility, just as a jury would, considering the instructions and the evidence, to determine whether, [appellant], you can be convicted of murder under the current law.  So that's what I will set about doing, making that determination after reviewing the transcript."

6.

The court delivered its ruling in open court on January 11, 2023, and issued the ruling in writing as well. The court found, based on its review of the evidence, "beyond a reasonable doubt that [appellant] had the required intent as an aider and abettor, that malice was not imputed to him. But based upon the law of aiding and abetting and the culpability that goes to an aider and abettor with the intent to kill, based upon his conduct and the assistance he rendered to the actual killer in this case, the Court finds that he is guilty of first degree murder of … Ryan." Accordingly, the court denied the petition.

## DISCUSSION

Appellant contends the court erred by denying his section 1172.6 petition because sufficient evidence did not support his guilt of murder.[2] We disagree.

### Standard of Review

"[A] trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty [of murder under a still-valid theory] beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

---

[2] Respondent contends appellant's record of conviction establishes ineligibility for relief under section 1172.6 as a matter of law because the jury was not instructed on the natural and probable consequences doctrine or the felony murder rule, and therefore must have found beyond a reasonable doubt that appellant was guilty as a direct aider and abettor. Appellant disagrees, and contends the jury instructions were vague so as to allow the jury to find appellant intended to aid the shooter in an unnamed crime lesser than murder without having the intent to kill.

We need not address these arguments. Here, the trial court made a finding that there was a possibility that malice could have been imputed to appellant and, it appears out of an abundance of caution, independently reviewed the evidence and determined beyond a reasonable doubt that appellant was guilty of murder under a still valid theory. We will not disturb the trial court's determination appellant had made a prima facie case and instead review its factual findings, including any it found were established by jury findings, under the substantial evidence standard.

We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

"Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)

***Relevant Legal Principles***

Senate Bill 1437 (2017-2018 Reg. Sess.) amended section 188 to prohibit the imputation of malice to a defendant "based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) It effectively abrogated the natural and probable consequences doctrine as a theory of liability for murder and attempted murder. (*People v. Curiel* (2023) 15 Cal.5th 433, 440 (*Curiel*).) Aider and abettors of a non-murder target offense can no longer be held liable for murder or attempted murder which was the natural and probable consequence of the target offense when the subjective mens rea of malice has not been proven on the part of the aider and abettor. (*People v. Lopez* (2023) 88 Cal.App.5th 566, 574–575.) In addition, it amended section 189 to revise felony murder liability, which is now limited to (1) actual killers; (2) those who acted with express malice in aiding and abetting first degree murder of the actual killer, and (3) " 'major participant[s] in the underlying felony' who 'acted with reckless indifference

to human life.' " (*People v. Wilson* (2023) 14 Cal.5th 839, 868–869, quoting § 189, subd. (e)(3).)

Section 1172.6 allows "[a] person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" to petition the court to have the petitioner's conviction vacated and be resentenced on remaining counts. (§ 1172.6, subd. (a).) To make a prima facie case, the petitioner must show, as relevant here: (1) a charging document was filed "that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime"; (2) the petitioner was convicted of murder; and (3) "The petitioner could not presently be convicted of murder … because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(1)-(3).) If the court finds the petitioner has made a prima facie showing the petitioner is entitled to relief, it must issue an order to show cause. (*Id.*, subd. (c).)

At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder … under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (*Ibid.*)

A defendant "cannot use a section 1172.6 resentencing hearing to relitigate facts already determined, whether by plea, admission, or verdict." (*People v. Rodriguez* (2024) 103 Cal.App.5th 451, 458, review denied Sept. 18, 2024.) "Section 1172.6 offers

resentencing for petitioners who have not been determined beyond a reasonable doubt to have the degree of culpability now required for a murder, attempted murder, or manslaughter conviction." (*People v. Strong* (2022) 13 Cal.5th 698, 720.) "Parties at a section 1172.6 evidentiary hearing must focus on 'evidence made relevant by the amendments to the substantive definition of murder.' " (*Rodriguez*, at p. 458.) "Indiscriminate relitigation of findings supporting murder convictions are not permitted." (*Id*. at p. 459.) "[F]actual findings should be given preclusive effect. The point … is to identify what those factual findings are and how they relate to the elements of murder under a valid theory." (*Curiel*, *supra*, 15 Cal.5th at p. 470.)

*Analysis*

Substantial evidence supports the court's finding that the People proved beyond a reasonable doubt that appellant was guilty of a valid murder theory. The trial court could decisively conclude the jury's conviction was not based on the natural and probable consequences theory or the felony murder rule because they simply were not instructed on those theories, which appellant conceded below. Accordingly, the court focused on appellant's assertions that malice may have still been imputed to him despite, or perhaps because of asserted vagueness in, the jury's instructions. Thus, the trial court correctly limited the issue to whether appellant harbored the intent to kill as a direct aider and abettor. The court correctly determined that direct aiding and abetting was still a valid murder theory. (See *Curiel*, *supra*, 15 Cal.5th at p. 521.)[3]

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of

---

[3]    In 2014, the California Supreme Court in *People v. Chiu* (2014) 59 Cal.4th 155 eliminated the natural and probable consequences theory for direct aiding and abetting first degree murder. (*Id*. at p. 166.) Notably, we have no knowledge of appellant filing a habeas petition or anything to request relief under *Chiu*. (See *In re Lopez* (2016) 246 Cal.App.4th 350, 356–358 [*Chiu* is retroactive to convictions that were final when *Chiu* was decided].)

committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promote, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

Here, the trial court could reasonably conclude that appellant's acts before, during, and after the murder demonstrated he directly aided and abetted the actual killer. In making its determination, the court noted the evidence showed that appellant slowed Ryan's momentum as he walked away from him, that "[s]everal witnesses testified credibly" that appellant beckoned or waved over the shooter and simultaneously pointed at Ryan. The court also noted that witnesses saw appellant and the shooter running away together and that another witness saw two men "gloating, giggling, and laughing" as they entered their vehicle to leave the scene. The court concluded that based on the circumstances of the shooting and appellant's actions, appellant "had the intent to assist the shooter in carrying out the shooting of … Ryan." The court also noted the evidence showed a motive. The court further noted that Weaver described one of the men he saw as muscular and that appellant was described at trial as "profoundly muscular." We find the court's comments supported by the evidence and that its inferences are reasonable. In addition, appellant lied about who picked him up on the night of the murder, which supports an inference appellant possessed consciousness of guilt after Ryan had been killed.

We reject appellant's arguments to the contrary. Appellant contends the conclusion that appellant was "one of the fleeing pair of giggling miscreants, who initially emerged from the white Honda and then vanished, laughing and gloating, into the night" was unreasonable. Appellant points out that Weaver's description of the men did not match appellant, the vehicle did not match appellant's car, and he failed to identify appellant in two photographic lineups. Appellant further points out that defense witness Mike Miller testified that he saw the shooter join up with another person in an

alleyway after the shooting, which supports the inference the person with the shooter was not appellant.

We recognize the importance of appellant's actions after the shooting, as they supported the inference that he intended to assist in the killing of Ryan by the shooter, rather than some other lesser assault. As we have stated, the evidence before the trial court supported this inference, and applying the substantial evidence review, we find no merit in appellant's arguments. The court could have reasonably relied on the other witnesses that saw appellant initially flee with the shooter and rejected Miller's testimony. The court could have also reasonably concluded Weaver was wrong about the color of the car he saw the men get into, as the car he described was the same make and model as appellant's car and had distinctive rims or wheel coverings like appellant's car. Contrary to appellant's suggestion, Weaver did not appear to ever definitively state that appellant's car was not the car he saw. The court could have reasonably concluded appellant was one of the men Weaver saw and inferred that he and the shooter arrived and left together in relation to the killing.

For the above reasons, we find no error.

## **<u>DISPOSITION</u>**

The court's order denying appellant's section 1172.6 petition is affirmed.

DE SANTOS, J.

WE CONCUR:

LEVY, Acting P. J.

SNAUFFER, J.

12.